# THE PEOPLE a. HARTUNG.

*Supreme Court, Third District; Oyer and Terminer, February, 1859.*

### NEW TRIAL.—MISBEHAVIOR OF JURY.[*]

On the trial of an indictment for murder, after the jury had retired one of their number took the opinion of the constable as to whether they could bring in a verdict of manslaughter, and they also sent for and examined the statutes. They subsequently asked the instructions of the court, and under those instructions brought in a verdict of guilty of murder.

*Held*, that the verdict could not be deemed to be affected by the misbehavior of the jury.

A new trial should not be ordered because of misbehavior of the jury, where it appears beyond all reasonable doubt that no injury to the defendant has resulted from it.

Affidavits of counsel and others, on information respecting misbehavior of the jury while considering their verdict, are not admissible to impeach the verdict.

That the constable sworn to attend the jury was present at their deliberations, is not ground of new trial.

The jury, after deliberating forty-eight hours, declared that they were unable to agree, but under the instructions of the court in a few moments afterwards rendered a verdict of guilty.

*Held*, under the circumstances not ground to impeach the verdict.

Motion for a new trial.

This was the prosecution of an indictment for murder. The prisoner having been convicted, now moved for a new trial upon grounds of the misbehavior of the jury.

*William J. Hadley* and *A. J. Colvin*, for the prisoner.

*Samuel G. Courtney*, district attorney of Albany county, and *Lyman Tremaine*, attorney-general, for the People.

HARRIS, J.—This application is founded upon irregularities, which are alleged to have occurred in the jury-room while the

---

[*] To the same effect is the People a. Wilson, *Post*, 137.

jurors were engaged in their deliberations. But *one* of these irregularities is established by proof. It *does* appear that one of the jurors inquired of a constable who was in attendance, whether the jury could not bring in a verdict of manslaughter, stating at the same time, that if they could do so, the whole jury would agree on such a verdict. The constable, in violation of his duty as well as his oath, undertook to give his opinion. He said he thought they could, but added, that they had better consult their foreman, who, *being a justice of the peace*, would probably know. The Revised Statutes were subsequently sent for by the jury, and their provisions in relation to the crimes of murder and manslaughter examined.

This proceeding on the part of the jury was a reprehensible irregularity, and is sufficient to vitiate the verdict, unless it appears beyond all reasonable doubt, that no injury has resulted from it to the defendant. It is necessary, therefore, to consider this question.

After the jury had thus endeavored to ascertain for themselves whether they could find the defendant guilty of manslaughter, they came into court and stated that they all agreed that the defendant was guilty to *some extent*, but were divided in opinion as to *the degree* of her guilt. They then inquired of the court whether they could render any other verdict than that of guilty or not guilty of the crime charged. They were instructed that a verdict of manslaughter would not be sustained by the evidence, and that guilty or not guilty of the crime charged was the only verdict which they could appropriately render. Under these circumstances, it cannot be possible that the defendant was in any way prejudiced by the attempt of the jury to ascertain, by consulting the Revised Statutes, whether they could not convict her of a minor offence. It is very certain, I think, that the verdict has not been affected, in the least degree, by the impropriety of the jury in seeking to inform themselves as to the law.

The other charges of misconduct, some of which if established, would be quite sufficient to avoid the verdict, are entirely unproved. These charges rest upon the affidavit of the defendant's counsel who do not profess to have any knowledge on the subject themselves, but make their statements upon their information and belief. Nor do they give the sources of such in-

formation. From the character of the charges, however, it may be inferred that it was derived from some one or more of the jurors themselves. The constables who were in attendance upon the jury have each, so far as they could, denied the truth of these charges.

No rule of law is better settled, than that the evidence of jurors is not to be allowed for the purpose of impeaching, or in any way impairing the effect of their verdict. The doctrine has long been established in England. It has been maintained with singular steadiness and unanimity in the United States. With the exception of Tennessee, where, following an early precedent, its courts have somewhat modified the rule, there is not, I think, another State, in which the rule has not been asserted and enforced. Even in Tennessee, where the affidavits of jurors have sometimes been received to prove facts which tended to vitiate their verdict, the courts have repeatedly declared that the practice was dangerous, and ought not to be extended a single step beyond what it had already attained.

But aside from all adjudications, the doctrine rests upon the clearest principles of public policy. It is infinitely better that the irregularities which, undoubtedly, sometimes occur in the jury-room, should be tolerated, rather than to throw open the doors and allow every disappointed party to penetrate into its secrets. The most enlightened jurists have united in deprecating the mischiefs which would flow from such a license. Nothing would be more sure to detract from the confidence or weaken the security which the community now feel in this justly cherished mode of trial. If this sanctuary were to be thrown wide open and an inquisition held upon the conduct of jurors, and the reasons upon which, individually, their verdict was founded, the trial by jury, now held in such sacred regard, could not long survive the dishonor to which it would inevitably be exposed.

But, if jurors should not be allowed to give evidence to destroy their own verdict, how much more objectionable it would be to allow them to expose the occurrences of the jury-room, and allow their unsworn and irresponsible statements to be brought, second-hand, before the court in support of an application to set aside their verdict. It is impossible to give the least effect to such statements without a fearful departure from the very first principles of evidence.

A point was made by the defendant's counsel, though it was not much pressed upon the argument, that the constables sworn to attend the jury, were one or more of them constantly present in the jury-room. The practice is not, in my judgment, to be commended, and yet it is almost, if not quite universal, and I know of no rule which prohibits it. Few verdicts could stand, if this were a ground of impeachment.

The only other ground urged by the defendant's counsel in support of their application is, that the verdict is not, and could not have been the result of that calm deliberation and concurring judgment which alone could fitly characterize so momentous an act. I have not thus regarded the action of the jury. From the commencement of the trial until their verdict was pronounced, I believe the jury were fully impressed with the solemnity of their duty. Certainly I have seen no evidence to the contrary.

It is true, that after they had been engaged in their deliberations *forty-eight* hours, they declared themselves unable to agree upon a verdict, and yet, in a very few minutes after, they rendered their verdict of guilty. To me, however, in view of all the circumstances, this fact does not seem surprising. The defence was presented with a degree of zeal and professional skill unsurpassed, if not unequalled in my experience of criminal trials. To all who witnessed the trial, its effect was manifest. It was felt by all. It awakened not only in the jury, but in all who took part in the trial, an active sympathy for the defendant. The press of the city, and the community generally, manifested a kindred feeling. It was under these circumstances and such influences, that the jury retired to deliberate upon their verdict.

The theory of the defence had been, that but one person was guilty of the crime as principal, and that the defendant was not that person. It is evident from the communications received from the jury during the progress of their deliberations, that much of their time was occupied with the consideration of the question, whether the defendant, or the other person whose name was associated with that of the defendant in the testimony, was most guilty. No juror seems, at any time, to have thought the defendant innocent. The question upon which they were divided in opinion was, which of the two persons implicated in the trans-

action was *most guilty.* Thus, in the communication made to
the judge by one of the jurors on Sunday evening, it is asked
whether, " if the jury, after the most careful and laborious in-
vestigation, are absolutely unable to find which of the inculpated
parties is *most guilty,* a verdict of *not guilty* could be rendered."
The communication made to the court on Monday morning, in-
dicates a similar division of opinion among the jury.   When,
in consequence of the instructions they then received, the jury
found themselves restricted to the single question, whether the
defendant was guilty or innocent of the crime charged, without
reference to the guilt or innocence of any other person, their
previous deliberations had prepared them to answer the ques-
tion.   Their work was done, and they at once and unanimously
said, she is not innocent—she is guilty. The verdict was clearly
warranted by the testimony.   The defendant had herself pro-
cured the poison.   She procured it, too, in a manner, and under
circumstances, tending strongly to prove a guilty purpose.   It
was in her own hands on Sunday evening.   On Tuesday it was
hastening to perform its deadly work.   It is *possible* that the
poison passed from the hand of the defendant to *another hand,*
by which it was administered to the deceased.   But the tes-
timony reveals no such hand.   And even if it were conceded
that another participated in the crime, the circumstances are
such as scarcely to warrant the jury in exonerating the de-
fendant from guilt.

Having thus considered all the grounds presented by the de-
fendant's counsel in support of their application, and, as I trust,
with an anxious desire that no injustice should be done to the
defendant, the conclusion to which I have been led is, that the
court is not at liberty to interfere with the verdict.

The motion for a new trial must therefore be denied.